**UNITED STATES, Appellee,**

v.

**Gary D. SPARKS, Technical Sergeant,
U.S. Air Force, Appellant.**

**No. 60760/AF.
ACM 26433.**

U.S. Court of Military Appeals.

Sept. 26, 1989.

Certiorari Denied Jan. 8, 1990.
See 110 S.Ct. 730.

TORILY BARRED FROM ACTING AS DEFENSE COUNSEL IN THE CASE.

II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY INSTRUCTING THE COURT MEMBERS THAT THEY SHOULD CONSIDER A PERMISSIBLE PRESUMPTION CONCERNING THE REGULARITY IN THE HANDLING OF APPELLANT'S URINE SAMPLE AT BOTH BROOKS AIR FORCE BASE AND THE CENTER FOR HUMAN TOXICOLOGY.

I

A

The charge against Sparks was preferred on April 21, 1987; and during the Article 32, UCMJ, 10 USC § 832, investigation, Sparks was represented by Captain Wells, a local area defense counsel. Captain Herman served as the government representative during the Article 32 hearing, see RCM 405(d)(3)(A), Manual for Courts-Martial, United States, 1984; and, after the charges had been referred to trial on May 27, 1987, he served the charges on appellant the next day in his capacity as trial counsel, see RCM 602. On June 1, he endorsed a defense request for delay of the trial, which had originally been scheduled to commence on June 3. A few weeks later, Captain Herman was transferred from the legal office at Nellis Air Force Base and became one of the base's area defense counsel.[1]

Appellant requested that Captain Wise, a circuit defense counsel, be assigned to represent him at trial; but ultimately, because of other trial commitments, this request was denied by Captain Wise's chief circuit defense counsel. At some point, after he had been assigned to be an area defense counsel, Captain Herman suggested that he might take over either of two urinalysis

For Appellant: *Major Lynne H. Wetzell* (argued), *Colonel Richard F. O'Hair* (on brief).

For Appellee: *Major Jeffrey H. Curtis* (argued), *Colonel Joe R. Lamport* and *Lieutenant Colonel Robert E. Giovagnoni* (on brief).

### Opinion of the Court
EVERETT, Chief Judge:

Sparks was tried by a general court-martial at Nellis Air Force Base, Nevada, on a charge of wrongfully using cocaine, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Contrary to his pleas, he was found guilty by the court members and sentenced to a bad-conduct discharge and reduction to Airman Basic. This sentence was approved by the convening authority; and the Court of Military Review affirmed the findings and sentence. 26 MJ 676 (1988).

Subsequently, we granted review on these two issues:

I

WHETHER THE MILITARY JUDGE ERRED BY NOT DISQUALIFYING CAPTAIN HERMAN AS APPELLANT'S TRIAL DEFENSE COUNSEL, AS CAPTAIN HERMAN WAS STATU-

---

1. As we understand Air Force policy, frequently a military lawyer who has served at a base legal office is assigned to be an area defense counsel at that base; but rarely, if at all, is an area defense counsel at a base later assigned to the base legal office.

cases that Captain Wells was to be defending "back to back." Appellant's was one of those cases; and, ultimately, after Sparks had "indicated" to Captain Herman "that ... he would be willing to use my services as his defense counsel, ... an attorney-client relationship" was formed between them.[2] Captain Herman made a full disclosure to Sparks of his prior participation as the government representative at the Article 32 hearing.

When trial began, Captain Herman advised the military judge of his prior activity in behalf of the prosecution. This had included contacting a laboratory technician who was expected to be a witness at trial, and several noncommissioned officers who were present at the urinalysis-inspection test. Captain Herman had prepared the necessary paperwork for the Article 32 hearing and had listened to testimony from witnesses. However, he had not conversed with any forensic toxicologist.

After being fully informed of this prior participation and being assured by Captain Herman that full disclosure had been made to Sparks, the military judge then questioned appellant at length as to his wishes. Sparks affirmed to the military judge that he thought it was in his best interest to be represented by Captain Herman; and, when asked why, he responded:

> Well, I've heard his testimony. And based upon his testimony that I've heard during the Article 32 hearing; and after the nonavailability of receiving an independent; and rather than things to go on as it was, and we have talked extensively; the few times that we have met together we've talked extensively about the case and he seemed pretty knowledgeable about the case itself as well as being pretty helpful to me in making decisions that I wasn't able to obtain

since 21 April when my charges were preferred.

The following colloquy then ensued:

> MJ: If you were to say to me today, "I would like another defense counsel," even if it's an individually requested counsel from some place else; or perhaps Captain Wise, because I understand he was not available at the date of trial, he may be available later on; if you were to say to me, "I would like Captain Wise," then I will give you all the time that you require, and we'll get Captain Wise and we'll make him available for you, if at all possible. And if not, Captain Wise we'll try to get someone else for you.
>
> This is a very serious problem because the law, and the Congress, and the President who wrote the Manual for Courts–Martial, is concerned that you may not get fair or good representation because Captain Herman has participated in the presentation of the case against you.
>
> Now, do you understand that problem?
>
> ACC: Yes, sir.
>
> MJ: Do you want to stay with Herman, or would you like me to go and get Wise for you?
>
> ACC: Like I say, originally when I— when I first—when I was first aware Captain Herman was area defense counsel, my original request, when it was denied—I wanted for him as well as an IDC to work closely together on the case. If an independent is brought in I would prefer that Captain Herman remain part of that.
>
> MJ: Well, that's not my question to you. My question to you is, do you want Herman or do you want someone else? Now Herman may be made available to assist the independent counsel. If you recall when I read you the rights,

---

**2.** As the Court of Military Review noted, the record of trial does not contain details concerning the severance of appellant's relationship with Captain Wells. However, no issue was raised as to the change of counsel; and the Court of Military Review was "convinced that the appellant desired to be represented at trial by Captain H[erman], and by no one else. However, when changes in counsel are made after formation of an attorney-client relationship, that fact and the reason therefor should be clearly set forth on the record." 26 MJ 676, 677 n. 1 (1988).

that if you are represented by military counsel of your own selection, then you could request that Captain Herman continue to represent you. And the officer who detailed him would then have the sole discretion to either grant or deny that request. So it's possible that Captain Herman could continue on the case, but that would be up to his detailing official, his boss. My problem is, and my concern is, that if we go forward today—if you want Captain Herman and we go forward today, you know what situation you are in, or if you want to wait and get Captain Wise then we'll delay this trial for as long as it takes and we'll get Captain Wise. Because all you have to do is twitch and Herman's off the case.

ACC: Yes, your Honor.

MJ: Because there is more than enough reasons to take Captain Herman off this case. And the only possible reason we could keep him on here is that you really, really, really, really, really, really want him.

Now, don't feel bad about making Captain Herman feel bad.

ACC: No, sir.

MJ: He doesn't really count, you understand what I mean?

ACC: More me than him.

MJ: That's right.

What's it going to be?

ACC: I have no problem with Captain Herman representing me, sir, as long as we could—I feel like if there's a little bit more time that we could spend together in going over the case.

MJ: Do you want more time?

ACC: Yes, sir, I would.

After a recess of almost 4 weeks, trial resumed before a different judge, who inquired again as to whether appellant wished to be represented by Captain Herman. At this time, the following colloquy took place:

MJ: Let me ask you, have you changed your opinion regarding your request for Captain Herman, given the fact that we've had a delay since the 15th of July until the present date?

ACC: No, sir.

MJ: You've had plenty of time to think about it?

ACC: Yes, sir.

MJ: You've had plenty of time to contact Captain Wise or other counsel to act as independent counsel for you?

ACC: Yes, sir.

MJ: Have you done so?

ACC: Not since the 15th, no, sir. I'm satisfied with retaining Captain Herman as my counsel.

MJ: All right. And you understood the purpose of the discussion by Judge Howell, that there is, apparently, a statutory prohibition against Captain Herman sitting?

ACC: Yes, sir.

MJ: All right. In your view, you have formed an attorney-client relationship with Captain Herman, and you are prepared to proceed to trial with Captain Herman as your counsel at today's hearing?

ACC: Yes, sir.

MJ: Do you have any questions about your rights to counsel?

ACC: No, sir.

MJ: Captain Herman, are you prepared to adequately represent the accused in this hearing?

DC: I am, Your Honor.

MJ: All right. Thank you.

Trial counsel, do you wish to be heard before I make a determination?

TC: No, Your Honor.

MJ: For both counsel, and for you, Tech Sergeant Sparks, I am aware that there is a statutory prohibition that could, in effect, prevent Captain Herman's serving as your defense counsel. However, I think your constitutional rights to counsel of your choice override any statutory prohibition.

If you assure me that you are satisfied with Captain Herman, and it is your wish that he represent you in this proceeding, I am prepared to recognize

him as your counsel, even contrary to that statutory prohibition.

ACC: Yes, sir.

MJ: That is your wish?

ACC: Yes, sir.

The judge then allowed the trial to proceed with Captain Herman as defense counsel.

B

The members of the court were assembled and evidence was presented concerning urine samples. Master Sergeant Martha Lynn testified that on December 18, 1986, she had been first sergeant of the squadron to which Sparks was assigned; and, pursuant to her unit's urinalysis program and procedures on which she was briefed at the hospital laboratory, she had been "the monitor" for obtaining urine specimens from "approximately 60" members of her organization. She had "picked up the bottles for the specimen"; placed labels on the bottles with the name and social security number of the person who was to give the specimen; had that person check the information written on the label; and given the bottle "to the observer." She continued:

And the observer and the member went into the latrine, collected the urine sample, then they came out again. The observer and the member would initial the bottle, and then I would seal the bottle, have the observer and the member to sign the urinalysis ledger, verifying that information, that the specimen was theirs, and that they observed them putting it, putting the specimen into the bottle.

And, then, if it was any, if the member was taking any type of medication or anything like that, anything went, you know, happened that was of incident, that was of significance would be written in the remarks section of the ledger.

And then the person was given their I.D. card, and they were told to leave.

There had been no problem in collecting the urine specimen from Sparks, although he had to remain "in the area . . . for a few hours before he provided a specimen." [3] On cross-examination, Master Sergeant Lynn acknowledged that, although she "had monitored another urinalysis, . . . the procedures were different than this." Also, the test had started 45 minutes late and urine had been collected from 3 or 4 more members of the squadron than had been required under the squadron's "original quota."

Technical Sergeant Frank Vargas, who had been an "[o]bserver" for the urinalysis conducted on December 18, 1986, described the procedures he had employed "every time"; and he identified the "particular bottle" in which he had seen "the accused put his urine." He had watched the bottle "being sealed"; and had not "notice[d] any problems or confusion when" he was "acting as the observer."

Technical Sergeant Thomas Wilhelmi testified that he was the noncommissioned officer in charge of the laboratory at the base hospital and was "also the base drug monitor." He described the procedures for labeling and initialing the bottles containing urine specimens and stated that all samples collected on the base for urinalysis were personally mailed either by himself or his shipping clerk. He testified that he had received the bottle containing appellant's urine specimen and had personally mailed it to Brooks Air Force Base by registered mail.

Next, Senior Airman Randolph Bennett testified that his duties at Nellis Air Force Base included handling registered mail. He also identified a document which showed that a package containing appellant's urine specimen had been sent by registered mail on December 22 and received on December 29.

---

3. When Sparks was unable initially to provide a specimen, Master Sergeant Lynn "collected the bottle back from the observer. I still had his I.D. card. I placed the I.D. card and the bottle into the slot in the box, and it remained there, in the box, until he was ready to provide a specimen."

Dr. Naresh Jain, an expert in forensic toxicology, described how cocaine may be ingested; what its effects are; and by what scientific procedure it may be detected. He was familiar with the Radioimmunoassay Test (RIA) used at Brooks Air Force Base laboratory for testing urine samples. He also knew the procedures and documents used at the Brooks laboratory in connection with urine testing and the procedures employed for transmitting samples found to be positive to the Center for Human Toxicology in Salt Lake City, Utah, where they would be further tested. He testified concerning the documents which purported to record the handling of the specimen obtained from Sparks. Accordingly, the documents reflected that appellant's sample had been found positive when tested by the RIA and also when tested by Gas Chromatography and Mass Spectrometry at Salt Lake City.

Defense counsel questioned Dr. Jain at length about the procedures that had been employed when appellant's urine specimen was tested at Brooks Air Force Base. He also asked Dr. Jain about a study which tended to indicate that "small, oral doses of cocaine" could be ingested without being detected by the user and "may cause positive urinalysis, positive urine results, test results for at least 48 hours using routine detection methods."

After the Government rested, the defense offered evidence of appellant's good character, testimony as to possible confusion in connection with obtaining the urine sample from Sparks, and evidence apparently intended to suggest that, if appellant had cocaine in his urine on December 18, 1986, it was by reason of unknowing ingestion of the drug. Sparks himself testified and denied taking cocaine. According to him, he had been shooting pool in a bar a couple of days before the urinalysis and had been drinking beer under circumstances where, unwillingly, he might have drunk from a glass of beer which contained some cocaine.

After all the evidence had been received, the military judge reviewed proposed instructions with the counsel. One of these instructions was to this effect:

As to the laboratories involved, both the USAF Drug Testing Laboratory, at Brooks Air Force Base, and the Center for Human Toxicology, at the University of Utah, there is a permissible presumption that their internal procedures, in the regular course of their business, ensures the integrity of the chain of custody from the time they receive a sample for testing until they render their report. You are not required to presume internal regularity in these laboratories, but you should consider this permissible presumption, with due regard for all the evidence presented bearing upon the chain of custody issue in this case.

No objection was expressed to this proposed instruction, which subsequently was used by the military judge with some variation ("that" was changed to "in"; "ensures" was changed to "to ensure").

## II

■ As appellate defense counsel emphasized, Article 27(a)(2), UCMJ, 10 USC § 827(a)(2), provides:

No person who has acted for the prosecution may act later in the same case for the defense, nor may any person who has acted for the defense act later in the same case for the prosecution.

*See also* RCM 502(d)(4).

Obviously the purpose of this prohibition is to avoid a conflict of interest or the appearance of such a conflict. Congress did not wish for information received by a prosecutor in confidence in his capacity as a representative of the Government to be revealed to an adverse party; and it did not wish to have an accused represented by an attorney who, because of his prior representation of the Government in the same case, was inhibited in the performance of his duties as a defense counsel. Of course, the ineligibility prescribed by Article 27(a)(2) accords fully with the ethics of the legal profession. *See, e.g.,* American Bar Association Code of Professional Responsibility EC 4–5 and DR 4–101(B) (1980); Mod-

el Rules of Professional Conduct, Rules 1.6, 1.7, 1.9, 1.11 (1983); *United States v. Catt*, 1 MJ 41 (CMA 1975).

■ However, not every error which concerns the appointment of court members or the referral of charges is "jurisdictional." For example, in *United States v. Blaylock*, 15 MJ 190, 193 (CMA 1983), we concluded that, even where a commander exercised command influence in violation of Article 37 of the Code, 10 USC § 837, the error was not "jurisdictional." In a similar vein, this Court stated in *Wright v. United States*, 2 MJ 9, 11 (CMA 1976):

> The rationale behind these separate lines of decisions leads us to conclude that no jurisdictional significance should be attached to Article 27 of the Uniform Code, as counsel merely augment the adjudicating tribunal and are not an integral part thereof. Defects in the appointment of trial counsel, Article 27(a), UCMJ, or in the qualifications of trial counsel, Article 27(b), UCMJ, are matters of procedure to be tested for prejudice. Article 59(a), UCMJ.

■ In *Wright*, the Court was concerned with the qualifications of trial counsel; and a distinction might be drawn here on the grounds that the qualifications of a defense counsel involve the important constitutional right to the assistance of counsel. However, if he makes an informed choice to dispense with counsel, an accused may defend himself. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Since an accused is constitutionally free to dispense entirely with counsel, and this right presumably supersedes even the provisions of Article 27 of the Code as to appointment of defense counsel, we conclude that Captain Herman's statutory ineligibility could not deprive the general court-martial of jurisdiction.

■ Even though Captain Herman's service as defense counsel did not deprive the general court-martial of jurisdiction to try Sparks, it presents the obvious question of whether appellant was prejudiced. In view of the potential for prejudice when a defense counsel has divided loyalties, we conclude that—without informed consent by the accused—the prejudice is automatic. It is far better to have a "bright-line" rule which avoids the appearance of evil than to undertake a detailed inquiry as to prejudice whenever Article 27(a)(2) of the Code has been violated.

■ If, however, an accused, after full disclosure and inquiry by the military judge, wishes to be represented by a defense counsel who previously had acted for the prosecution, an accused has no complaint, so long as his chosen counsel meets the customary standards of professional competence.[4]

Two cautious military judges inquired carefully as to the adequacy of the disclosure and as to appellant's desire to be represented by Captain Herman. From our examination of the record, it is clear that Captain Herman defended Sparks with great skill. Indeed, Captain Herman's familiarity with urinalysis—which he had acquired as a prosecutor—stood him in good stead in defending the accused. As far as we can determine, appellant made a wise choice in seeking the services of this attorney.

■ Article 27(a)(2) creates a disqualification which can be asserted not only by the defense but also by the Government; *see also* RCM 502(d)(4). No such assertion was made by the Government—which apparently felt it had a strong case and did not care who represented Sparks. Of course, having secured a conviction, the Government is in no position to complain.

■ We should make clear, however, that—even though, with appellant's consent, the military judge was free to allow

---

4. If the defense counsel whom the accused has chosen is precluded from using certain information or presenting certain evidence because it was acquired while he was acting for the prosecution and if, before the accused gives his consent, the defense counsel has disclosed that he would be limited in this manner in representing the accused, the accused cannot complain that his attorney has violated the accepted standards of practice.

him to be represented by Captain Herman—the judge was not required to allow such representation. In *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the Supreme Court held that, despite a defendant's willingness to be represented by an attorney who was disqualified because of a conflict of interest, the District Court did not have to allow such representation. Similarly here, the military judge had the discretion, with appellant's consent and absent any objection from the Government, to allow Captain Herman to represent Sparks. However, the judge, if he had chosen to do so, would have been equally free under these same circumstances to prohibit Captain Herman from serving.

### III

As recognized implicitly by Mil.R.Evid. 803(6), Manual, *supra*, human experience teaches that the documents and records compiled "in the course of a regularly conducted business activity" tend to be trustworthy. In this case, Doctor Jain had testified for the Government about the procedures customarily followed in the drug-testing laboratories at Brooks Air Force Base and at the Center for Human Toxicology. The government evidence tended to show that these procedures had been followed in appellant's case.

The military judge's instruction apparently was intended to advise the court members that they could consider the testimony about the internal procedures followed in these laboratories in deciding whether the Government had established the chain of custody. This, of course, related to the judge's preceding instruction that the court members must be satisfied beyond a reasonable doubt not only as to the accuracy of the testing "but, also, that it was, in fact, the accused's urine which was tested" and that "the process of establishing that a sample tested was that provided by the accused is often referred to as 'chain of custody.'"

 The instruction of which appellant now complains should have been phrased in terms of "inference" rather than "presumption." However, the judge did explain that the "presumption" was "permissible"; and defense counsel did not complain of the instruction, either when it was first proposed or after it had been given. Furthermore, the instruction concerned the internal procedures followed at the drug-testing labs, rather than the procedure employed in collecting the urine specimens in the first instance—which the defense had claimed at trial was irregular. We find no plain error in giving the instruction; and so any issue with respect thereto has been waived for appeal. RCM 920(f); *United States v. Fisher*, 21 MJ 327 (CMA 1986).

### IV

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.